# RESIDENTIAL FINANCE GROUP
# LOAN OFFICER EMPLOYMENT
# AGREEMENT



THIS AGREEMENT ("Agreement") is made this _26_ day of _May_, 2006 (the "Effective Date") between Residential Capital Corporation (hereafter "Employer" or "Company") and _Denise M. Johnson_ (hereafter "Employee").

WHEREAS, Employer is in the business of mortgage banking, and desires to hire and/or retain Employee in its employ to originate real estate trust deed and/or mortgage loans on one-to-four unit properties and other associated products as deemed appropriate by Employer, and

WHEREAS, Employee is ready, willing and able to work for Employer as a Loan Officer, and

WHEREAS, Employee's compensation is determined primarily by way of commissions as detailed in Attachment A of this Agreement, which is incorporated by reference herein as though set out at length, as may be modified from time to time, on monthly originated and closed loans due to Employee's individual effort, and

WHEREAS, Employer and Employee desire to have an employment agreement directly specifying compensation, termination and other terms of employment,

NOW, THEREFORE, Employer and Employee in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration and intending to be legally bound hereby, agree as follows:

I. EMPLOYMENT
   A. GENERAL
      Employer hereby hires Employee and Employee hereby accepts employment as a Loan Officer under the terms of this Agreement commencing on the date hereof and continuing until terminated as provided in this Agreement.

   B. REPRESENTATIONS AND WARRANTIES
      Except as disclosed in Section VIII(E)(1), Employee represents and warrants that Employee is not subject to any continuing contractual obligations of a former employer including, but not limited to, continuing contractual obligations that restrict employee from being employed by Employer (non-compete agreement) or that prevent Employee from soliciting or hiring employees of Employee's former employer(s) (non-solicitation agreement).

      Employee represents and warrants that Employee's performance under this Agreement is and will be in full compliance with all applicable federal, state, and local requirements as well as all Employer policies and procedures.

      Employee represents and warrants that Employee has, and will maintain throughout the term of this Agreement, all licenses materially necessary for the lawful performance under this Agreement.

   C. LIMITATION OF EMPLOYEE'S AUTHORITY
      Until such time as Employee receives Desktop Underwriting (DU) certification, Employee shall have no authority to issue a loan commitment or modify the terms of a loan commitment. After receiving DU certification, Employee shall have the authority within delegation to issue commitments and modifications thereof for loans that have received DU approval. Employee shall have no authority to enter into any other contract or agreement, which would be binding on Employer without the prior written approval of Employee's Division Manager and/or Regional Manager.

## II. DUTIES AND RESPONSIBILITIES

A. Employee agrees to devote Employee's full time, attention and energy to the position of Loan Officer as outlined in the loan officer job description as published by the Employer from time to time subject to the direction and control of Employer and shall utilize Employee's best efforts in the representation of this position and the solicitation of customers for Employer.

B. Employee is employed as a Loan Officer to originate real estate trust deed and/or mortgage loans on one-to-four unit properties ("loans") and to represent Employer with respect to other associated products as deemed appropriate by Employer in the territory designated by Employer. The term "Originate" as used in this Agreement, includes counseling the customer, taking of applications, pricing of loans, coordinating and assisting in the processing and closing of Loans and such other duties as set forth in policies, procedures and guidelines adopted by Employer for loan officers.

C. Employee agrees not to engage in the sale of or represent any other product or service that the companies of GMAC Residential Holding Corp. offer while employed by Employer including, but not limited to, the origination of trust deed and/or mortgage Loans for Employee's own account or for any other mortgage banker or broker. Employee, at all times, will comply with Employer's policies, procedures and code of ethics and the rules, regulations, laws and ethics of the mortgage banking industry, investors, HUD, VA, GNMA, FNMA, FHLMC, local jurisdictions, state and federal governments. Employee agrees to only engage in mortgage banking transactions in the States that employee is licensed as designated by employer's licensing unit.

D. Employee, as a condition of Employee's employment, shall at all times possess a valid motor vehicle driver's license, a vehicle in good working condition and active state required automobile insurance coverage. Employee shall provide evidence thereof at time of employment and thereafter at any time requested by Employer.

E. Employer's lending policy is to treat all loan applicants in a manner that is fair, reasonable and non-discriminatory. Employee agrees to adhere to the Employer's Fair Lending Guidelines when originating, pricing, underwriting, processing and closing loans. Failure to comply with the Fair Lending Guidelines may subject Employee to disciplinary action, up to and including termination of employment.

F. Employee, as a condition of employment, shall take and attend all required training and compliance courses, seminars, workshops and attend any and all meetings related thereto as set forth by Employer. Employee shall maintain compliance with all of Employer's sourcing strategies (builder, GM Family and Supplier, new markets, etc.) including all affirmation policies associated with said strategies. In addition, Employee understands that they are required to read and comply with all provisions and periodic updates made with respect to loan originations and sourcing strategies as detailed on Employer's Intranet. Employee agrees and understands that Employee is responsible for regularly reviewing Employer's Intranet, including but not limited to the Lending Page and Corporate Compliance Page in order to be kept abreast of Employer policy and/or procedure changes and revisions, supplements or rescissions to this Agreement (collectively "Updates"). Employer will provide Employee with written notice of such Updates as they occur. For purposes of this Agreement, written notice shall be defined as electronic (via email or intranet) or hard copy communication ("Written Notice").

G. Employee must generate at least $600,000 in closed loan volume or 6 (six) units each month, which must be sustainable business, which as used in this Agreement includes, but is not limited to purchase transactions, builder business, new market business and GM Family and Supplier. Further, the Divisional Manager may establish written requirements that certain levels of production be maintained (i.e. GM Family, FHA, Purchase, etc.) The Divisional Manager has the discretion to change the minimum production standards, at any time, upon prior Written Notice to Employee. The new minimum production standards will be effective the first day of the first month after the date of

the Written Notice. If Employee fails to meet the minimum production standards, disciplinary action, up to and including termination may result.

    H.    Employee is not eligible for paid time off (PTO) in accordance with Employer's Employee Handbook. Employee agrees that all vacation requests must be approved by Employee's District Manager at least 30 days in advance. Employees not meeting minimum production standards as defined herein may not be approved for vacation. Employee is still required to meet minimum production standards in months where a vacation is scheduled.

III. EMPLOYEE OBLIGATIONS

Employee must adhere to all Employer polices and procedures as well as all local, state and federal laws and/or regulations, including, but not limited to FCC and FTC regulations regarding the sending and placing of unsolicited facsimiles and telephone calls. By Employee's signature below, Employee acknowledges that they are solely responsible for any monetary losses incurred by Employer as a result of Employee's breach of this Section.

IV. SALES INCENTIVE

Employer may sponsor sales incentive programs for employees. No award or bonus shall be deemed earned nor shall it be distributed to the Employee unless Employer employs the Employee at the time of the scheduled distribution of the award or bonus. No cash equivalents or other substitutions will be made under any circumstances. The award or bonus is not assignable or transferable by Employee during his/her lifetime or in the event of his/her death.

V. LICENSES AND RESTRICTIONS ON USE

Employee, where required by law or Employer for the conduct of Employer's business, must possess a current real estate salesperson's, broker's or mortgage banker's license. The license shall be kept in the Employer's designated office. Any Employee possessing a real estate salesperson's or broker's license shall not, under any circumstances, actively sell or participate in any manner as a salesperson or broker in the sale of any real property for any real estate firm, developer, broker, land dealer, or home builder. The only exception being the buying and selling of real property belonging to said Employee.

VI. TERMINATION

This Agreement shall automatically terminate upon the occurrence of any one of the following events:

    1. Death of the Employee.
    2. Loss of legal capacity by Employee.
    3. Termination of employment, voluntary or involuntary.
    4. Disbarment, suspension or other limitation imposed by HUD, VA, GNMA, FNMA, FHLMC, the Securities and Exchange Commission or any other government agency on the ability of Employee to do business with such agency.
    5. Transfer to any non-commissioned position with Employer.

VII. EXISTING EMPLOYMENT

If Employee is employed by Employer as of the date of this Agreement, Employee acknowledges and agrees that Employee's current employment with Employer is an employment "at-will" subject to termination at any time by Employer and that the execution of this Agreement shall supersede and replace any written or oral agreement, policy or understanding between Employee and Employer relating to the terms and conditions of Employee's employment to the extent they are inconsistent with this Agreement.

VIII. RESTRICTIVE COVENANTS
    A.    Confidentiality Obligations. During the term of Employee's employment, Employee will not directly or indirectly use or disclose any Confidential Information or Trade Secret except in the interest and for the benefit of Employer. After the end of Employee's employment with Employer, for whatever reason, Employee will not directly or indirectly use or disclose any Trade Secret or Confidential Information. Wisconsin Employees may not, for whatever reason, directly or indirectly use or

disclose any Confidential Information for a period of 24 months following the end of Employee's employment with Employer. Employee further agrees not to use or disclose at any time information received by Employer from others except in accordance with the Employer's contractual or other legal obligations including, but not limited to, the Gramm Leach Bliley Act; the Employer's customers are third party beneficiaries of this promise. Employee agrees that it shall remain fully responsible for any such use or disclosure and further agrees to indemnify Employer from and against any claims arising out of such prohibited use or disclosure by Employee.

Employee agrees not to disclose any Confidential Information to any third party or copy Confidential Information without written approval of Employer and inform those third parties and other persons who receive Confidential Information of its confidential nature and obtain (or have obtained) their written agreement to abide by the obligations set forth herein. Any copies made shall retain all confidential and proprietary markings of the original. By disclosing the Confidential Information, Employer does not grant any express or implied license or other rights to or under its copyrights, trademarks, or trade secrets.

Nothing in this Agreement shall prevent Employee, after the end of employment with Employer, from using general skills and knowledge gained while employed by Employer.

B. Definitions. For purposes of this section of the Agreement, the following words and phrases shall have the following definitions:

1. Trade Secret. The term "Trade Secret" includes, but is not limited to, information, including a formula, pattern, compilation, program, device, method, technique, or process that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and, is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

2. Confidential Information. The term "Confidential Information" means all non-Trade Secret information (i) of, about or related to Employer, (ii) created by Employer or Employee or otherwise coming into Employee's possession or control, (iii) or provided to Employer by its customers, that is not known generally to the public or the Employer's competitors. Confidential Information includes but is not limited to: technical specifications and operating manuals; services and information concerning current, future, or proposed products and services and combinations of products and services; product and services descriptions; financial information about the Employer or its customers; information related to mergers or acquisitions; passwords and security procedures; computer programs, software, and software documentation; customer and/or prospective client lists, mortgage loan files, applications and all other information relating in any way to the customer and/or prospective client and printouts; records; policies, practices and procedures of Employer; training manuals; commission statements; files; records of the accounts of customers; sales and marketing strategies and plans; pricing strategies; personnel information and business records; and information which is marked or otherwise treated or designated as confidential or proprietary by Employer.

3. Exclusions. Notwithstanding the foregoing, the terms "Trade Secret" and "Confidential Information" do not include, and the obligations set forth in this Agreement do not apply to, any information which: (i) can be demonstrated by Employee to have been known by him/her prior to his/her employment by Employer, (ii) is or becomes generally available to the public through no act or omission of Employee; (iii) is obtained by Employee in good faith from a third party who discloses such information to Employee on a non-confidential basis without violating any obligation of confidentiality or secrecy relating to the information disclosed; (iv) is independently

       developed by Employee outside the scope of his/her employment without use of Confidential Information or Trade Secrets; or (v) is Employee's own personnel information.

       4. Customer. The term "Customer" means any individual or entity for whom/which Employer has provided services or products or made a proposal to perform services or provide products.

C. Return of Records/Property. Upon the end of employment with the Employer, for whatever reason, or upon request by the Employer, Employee shall immediately return to Employer all of its property, documents, records, and materials belonging and/or relating to the Employer (except Employee's own personnel and wage and benefit materials relating solely to Employee), and all copies of all such materials. This obligation includes, but is not limited to, the obligation to return to Employer any equipment (including but not limited to telephones, pagers, cameras, computers, printers and fax machines) owned by Employer together with any images or copies of any part of a computer hard drive. Upon the end of Employee's employment with Employer, for whatever reason, or upon request by Employer, Employee further agrees to destroy such records maintained by him/her on his/her own computer equipment and promptly make available to Employer such equipment for inspection to ensure compliance with Employee's obligations under this Paragraph.

D. Non-Solicitation of Employees. Employee agrees that during Employee's employment and for a period of twelve months after Employee's employment terminates (regardless of the reason for the termination), Employee will not: solicit for employment, either directly or indirectly, any person who is employed by Employer; advise or encourage, either directly or indirectly, any employee of Employer to terminate his/her employment with Employer; or advise, encourage or abet any person or entity, either directly or indirectly, to solicit any such employee for employment with someone other than Employer.

E. Employee Disclosures and Acknowledgments
       1. Confidential Information of Others and Contractual Obligations. Employee certifies that Employee has not, and will not, disclose or use during Employee's time as an employee of Employer, any confidential information which Employee acquired as a result of any previous employment or under a contractual obligation of confidentiality or secrecy before Employee became an employee of Employer. All prior obligations (written and oral) that Employee has entered into which restrict Employee's ability to perform any services as an employee for Employer, such as confidentiality agreements, non-compete agreements and non-solicitation agreements, shall be listed below under the heading List of Prior Obligations. If none, please so state.

       List of Prior Obligations (attach additional sheets and/or documentation if necessary):

       _____
       _____
       _____

       2. Scope of Restrictions. Employee acknowledges and represents that the scope of the restrictions contained in this Agreement are appropriate, necessary and reasonable for the protection of Employer's business, goodwill, and property rights. Employee further acknowledges that the restrictions imposed will not prevent him/her from earning a living in the event of, and after, the end of his/her employment with Employer, for whatever reason.

       3. Prospective Employers. Employee agrees, during the term of any restriction contained in this Agreement, to disclose this Agreement to any entity which offers employment to Employee. Employee further agrees that Employer may send a copy of this Agreement to, or otherwise make the provisions hereof known to, any of Employee's potential employers.

    F.    Injunctive Relief. Employee agrees that damages will be an inadequate remedy for breaches of this section of the Agreement and in addition to damages and any other available relief, a court shall be empowered to grant injunctive relief.

### IX. AFFILIATES OF EMPLOYER

Recognizing that Employer may conduct its business at various times under one or more different entities, Employee agrees that the provisions of this Agreement shall be for the benefit of and may be enforced by Employer and any of Employer's present or future affiliates as designated by Employer.

### X. PROGRAM REVIEW AND AMENDMENTS

Employer reserves the right from time to time, by Written Notice to Employee, to change any of the terms and conditions of this Agreement and its Attachments, including, but not limited to, the compensation schedules for all loan and ancillary product programs. Unless otherwise set forth herein, or in the Written Notice, such changes shall be binding on Employee effective on the date of the Written Notice.

### XI. FURTHER ASSURANCES

Employer may have the need to update Employee records, personnel files and conduct background investigations. Accordingly, Employer may from time to time require Employee to disclose accurate and complete information regarding Employee's qualifications, background and relationships which may present a conflict of interest or which may otherwise bear on the Employee's qualifications and/or Employer's reputation. Upon request by Employer, Employee shall complete and provide such information and documentation as Employer reasonably requests, including but not limited to, Employer's Consumer Report Disclosure and Authorization forms, Conflict of Interest Questionnaires, Employment of Relatives and Disclosure Agreements, and such other forms, authorizations, documents, consents and waivers as needed by the Employer, at any time, to ensure compliance with Employer's policies, procedures and any applicable laws and regulations. Unsatisfactory results from a background investigation, violation of Employer policies or procedures or failure to comply with the provisions outlined under this Section may result in disciplinary action up to and including termination of employment.

### XII. MISREPRESENTATION

Employer maintains a "Zero Tolerance" policy on matters relating to fraud or misrepresentation. Employee will not engage in any act deemed to be relating to fraud or misrepresentation, examples of which include but are not limited to forging signatures, hand-carrying documents such as verifications of employment, assisting in preparing income documentation/verification, falsification of bank statements and/or assets, failure to disclose borrower's liabilities, knowingly misrepresenting occupancy of the property in question, failure to disclose or act upon known instances of fraud or misrepresentation and colluding with appraisers to inflate the value of the property in question. Engaging in any of these activities or any illegal activities may be subject to disciplinary action and may result in immediate termination of employment for cause, at the discretion of the Employer. Further, participation in fraud or misrepresentation may result in criminal prosecution.

### XIII. RESERVATION OF RIGHTS

Employer reserves the right to pursue any legal recourse otherwise available against Employee in order to recover or prevent any loss, cost or expense to Employer resulting from Employee's deliberate misconduct, breach of this Agreement, violation of law or violation of any policy or procedure of Employer. No third-party agreement to which Employer may be a party shall preclude this Reservation of Rights.

### XIV. SEVERABILITY

If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, then the remaining provisions of this Agreement, if capable of substantial performance, shall remain in full force and effect.

XV. ENTIRE AGREEMENT
This Agreement embodies the parties' entire agreement and supersedes and replaces all previous employment and compensation agreements between the parties, whether oral or written. Except as otherwise specifically set forth, no variations, amendments, modifications or changes to the terms and conditions set forth herein shall be effected unless contained in writing, duly executed by or on behalf of the parties hereto. All Exhibits referred to herein and all changes, alterations, amendments, modifications and waivers are incorporated herein by reference. In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of any oral or written employment policy of Employer, the terms and conditions of this Agreement shall govern.

XVI. CONSTRUCTION OF AGREEMENT
This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Pennsylvania, without regard to its conflicts of law rules.

XVII. CAPTIONS
The captions contained herein are inserted only for the purpose of convenient reference and in no way define, limit or describe the scope or intent of this Agreement or any part hereof.

XVIII. ASSIGNMENT AND BINDING EFFECT
The terms of this Agreement shall inure to the benefit of and shall be binding upon the heirs, administrators, successors and assigns of the parties hereto, except that Employee shall not have the right to assign any interest Employee may have in this Agreement.

XIX. NO WAIVER
No delay or omission by Employer to exercise any right or power it has under this Agreement shall impair or be construed as a waiver of such right or power. A waiver by Employer of any breach or covenant shall not be construed to be a waiver of any succeeding breach or any other covenant.

XX. EMPLOYMENT AT WILL
Employee acknowledges that Employee's employment with Employer is at-will. Employer or Employee may terminate Employee's employment without notice at anytime and for any reason not prohibited by law. Any representation to the contrary is not binding upon Employer unless signed in writing by a member of the Employer's Executive Committee and the Employee.

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year above written.

_____   _____
WITNESS                      Employee

_____
District Manager

Or

_____
Regional Manager

## ATTACHMENT A
## GMAC MORTGAGE CORPORATION
## LOAN OFFICER COMPENSATION AGREEMENT

A. Employee shall be entitled to compensation in accordance with the terms of this Agreement. Employee shall not be entitled to any other compensation unless otherwise provided for in this Agreement or approved in writing, in advance, by the appropriate Region or Division Manager or Group Senior Vice President of Retail Lending. For the services rendered by Employee under this Agreement, Employer shall pay Employee compensation on Loans originated by Employee or other services performed in accordance with the terms and conditions set forth in this Agreement. Compensation related to commissions (as detailed in Section B Earned Commissions) will be paid on the last regularly scheduled payday of the month following the month in which the loans were Closed and funded on the Employer's system.

B. EARNED COMMISSIONS
   1. A commission is deemed earned when a loan closes and/or transfers to servicing and all Employer policies and/or procedures are adhered to and completed by Employee.
      a. For the purposes of this Agreement, a loan is "Closed" when settlement is completed and the mortgage funds are actually disbursed to the mortgagor. (For example, the closing date for a refinance loan occurs on the expiration of the three (3) day right of rescission period and the funds are actually disbursed to the mortgagor).
      b. For the purposes of this Agreement a loan "transfers to servicing" when a stand-alone home equity funding is confirmed by the closing agent, the closing package is received by the post-closing unit and the status in the Employer's system is changed to "transferred to servicing."
      c. Policies and/or procedures that must be met, include but are not limited to, locking a loan properly, locking interest rates properly, getting an extension on a rate lock prior to its expiration, not drawing documents for a loan where the rate lock has expired without getting an extension, refinance guidelines with respect to churning, quoting all loan rates and fees properly, originating and/or processing loans within lending guidelines, ensuring the disclosure of necessary information on the application that may affect a credit decision so a monetary loss to Employer can be prevented and avoiding any conduct that will cause Employer to have an income loss on a loan file or affect the salability of a loan. This list is designed to provide examples for guidance purposes, but is not inclusive of every policy and/or procedure that must be adhered to. Any violation of Employer policy and/or procedure is grounds for disciplinary action, up to and including termination of employment.
   2. Overage
      a. Overages, if any, are not to be charged based on any of the prohibited factors set forth in the Fair Lending Guidelines. Neither rates nor points to minorities or other members of a protected class (persons having one or more of the prohibited factors as set forth in the Fair Lending Guidelines) can vary from those charged to non-minority or non-protected class applicants having similar credit profiles. Employee must exercise the utmost diligence to ensure that such variances do not occur.
      b. Overages are limited to 2% on all products unless otherwise designated in this Agreement or other pricing policy communications. Overages on FHA insured loans can be charged only if the Overage when added to other pricing variations for similar loan types, in the same MSA (or, if the production office is not located in an MSA, the jurisdictional area of the local HUD field office) do not exceed an allowable tiered pricing variation of 2%. Employee should review any questions regarding that policy with Employee's Manager.
      c. Subsidy may generate overage on EZPrice loans. However overage is not permitted on the following:
         1. HomeStrength loans

2. Bond Programs except on CALHFA loans
3. Any loan using additional subsidy above the stated EZPrice rate and price.
4. Lot Loans
5. Loans to employees of ResCap and its subsidiaries.
   d. Overage on core GM Family loans is limited to 1%. Core GM Family is defined as dealer employee, GM employee, GM retiree, GM Saturn employee, GMAC Finance employee, EF-Dealer employee, EF-GM employee, EF-GM retiree, EF-GM Saturn employee, EF-GMAC Finance employee, EF-GMAC Mortgage employee, EF-GMAC RE Corporate, EF-MIC, GMAC RE agents, EF-GMAC RE agents, GM Consumer, and Latino initiative.
   e. Overage on extended GM Family loans is limited to 2%. Extended GM Family is defined as follows: GM Supplier, GM Shareholder, Hughes employee, EF-Hughes employee, Hughes/Boeing employee, Hughes/Boeing retiree, EF-Hughes/Boeing employee, EF-Hughes/Boeing retiree, Raytheon, EF-Raytheon, Delphi employee, EF-Delphi employee, EF-EDS Employee, and EDS employee.
   f. Programs excluding overage are either posted in the product announcement or the Lending Page on the Employer intranet.
   g. As part of its auditing procedures, Employer will audit Employee's loan files for compliance with the requirements of this section. To the extent it is determined that Overages were imposed in violation of the requirements of this section ("Excess Overages"); Employee is liable to Employer for the amount of the Excess Overages. The Excess Overages will be an Obligation of Employee to be recovered by Employer as outlined in this Agreement.
   h. Overage Commission will be paid at a 50/50 split of overage collected and is limited to a total of one percent (1%) of the loan amount.
3. Employee shall earn no commissions on loans from which the Employer earns no net origination margin. This includes, but is not limited to, 2nd mortgage bond programs such as the CT Housing 2nd mortgage bonds.
4. A loan for which no commission is earned is not considered a funded loan for any purposes of loan officer compensation, including but not limited to any payment included in either your commission rate tier or any other part of your compensation plan.
5. Company Investment Loans
   a. Employee earns a flat $500 commission and no overage for loans that are intentionally placed in Company Investment for business reasons.
   b. No commission will be earned for loans that are placed in Company investment (e.g. 7500 Commitment) due to a violation of Employer polices and/or procedures as detailed in Section B(1)(c) Earned Commissions above unless otherwise agreed to by both the Division Manager and Group Senior Vice President of Retail Lending.
6. Employer reserves the right to reconcile Employee's commissions as allowed by state law at a future date if a commission was improperly paid, in whole or in part, on a loan for which all conditions are not met regarding the loan process. Commission reconciliation can include a partial or full commission amount being deemed unearned for failure to satisfy certain conditions. Employee will be notified of any commission reconciliation by Employer.

C. CALCULATION OF COMMISSIONS
1. BPS Commission Rate
   a. The basis point Commission Rate is determined by either (i) the cumulative dollar volume of all Closed loans each month, or (ii) the total number of Closed loans each month, including first and second mortgage loans, whichever is more favorable to Employee (see table below).

| Total Monthly Funding Volume | Total Monthly Units | Commission Tiers (Rate per loan) |
|---|---|---|
| 0 to $249,999 | <3 | 25 bps |
| $250,000 to $374,999 | 3 to 4 | 35 bps |
| $375,000 to $499,999 | 5 | 40 bps |
| $500,000 to $999,999 | 6 to 9 | 50 bps |
| $1,000,000 to $1,499,999 | 10 to 14 | 65 bps |
| $1,500,000 to $1,999,999 | 15 to 19 | 70 bps |
| $2,000,000 or greater | 20 or more | 80 bps |
| ALL GM to GM Refinance Loans | | Lower of applicable commission tier or 45 bps |

- For purposes of determining applicable Commission Rate:
    - The home equity line amounts on piggybacks and stand-alones will be included in Total Monthly Funding Volume.
    - All first mortgage and standalone home equity lines and loans will count as 1 Unit. Purchase money piggybacks will count as ½ Unit. Credit-only piggybacks will count as 0 Units.

  b. Commission Rate Adjustments (to be applied on a loan by loan basis). Commission Rate adjustments will be made on certain types of first mortgage loans as detailed below in Section (C)(1)(b)(1-8) Calculation of Commissions. However, the following general rules shall apply to any such adjustments:

    - The Commission Rate of GM to GM Refinance loans is not adjusted.
    - Adjustments are not stacked except for
        - The GM Family offers
            o $250 credit back (adjustment #1 below)
            o $500 closing cost rebate (adjustment #2 below)
        - And core GM Family loans originated in Michigan (adjustment #3 below)
    - If loan is eligible for multiple adjustments, then the highest applicable adjustment will apply.

  1. All GM Family loans with $250 credit (excluding GM to GM Refinance loans) – 5 BP reduction in Commission Rate per affected loan not to exceed $125.
  2. All GM Family loans with $500 closing cost rebate – $250 reduction in commission
  3. All GM Employee, GM retiree, GM Saturn Employee and GMAC Finance Employee loans (excluding all Extended Family and GM to GM Refinance loans) originated in the state of Michigan – 5 BP reduction in Commission Rate per affected loan.
  4. Brokered Out Loans – 15 BP reduction in Commission Rate per affected loan. (This adjustment does not apply on loans brokered to Homecomings.)
  5. Bond Program – 15 BP reduction in Commission Rate per affected loan. (This adjustment applies only to Servicing Released or Interim Servicing loans. It does not apply to Servicing Retained loans.).
  6. Government Fixed Loans – 10 BP increase in Commission Rate per affected loan.
  7. Jumbo Loans $650k to $1,000k – 5 BP reduction in Commission Rate per affected loan.
  8. Jumbo Loans above $1 million – 10 BP reduction in Commission Rate per affected loan.

2. GM Family Loans
   a. GM Family loans are defined as loans to GM employees including all GM subsidiary employees, GM Dealership employees and GM Supplier employees. All GM loans are

required to be coded properly. Any findings that loans are coded improperly will be cause for termination. Coding is as follows: EDS employee, Dealer employee, GM employee, GM retiree, GM Saturn employee, GMAC Finance employee, GMAC Mortgage employee, Hughes employee, Raytheon, Delphi employee, GMAC RE Corporate, MIC employee, EF-EDS employee, EF-Dealer employee, EF-GM employee, EF-GM retiree, EF-GM Saturn employee, EF-GMAC Finance employee, EF-GMAC Mortgage employee, EF-Hughes employee, EF-Raytheon, EF-Delphi employee, EF-GMAC RE Corporate, EF-MIC, GM Shareholder, GMAC RE agents, GM Supplier, Hughes/Boeing employee, Hughes/Boeing retiree, EF-GMAC RE agents, EF-Hughes/Boeing employee, EF-Hughes/Boeing retiree, GM Consumer, and Latino Initiative. Coding loans improperly is considered a violation of Employer policies and procedures. All commissions for loans that have been coded improperly are deemed unearned and will not be paid unless prohibited by state law.

3. *Brokered Out Loans*
   a. Brokered loans are only allowed for products that Employer does not offer or cannot approve. Loans may only be brokered out to approved broker out lenders. All loans to be brokered out require the written approval of the appropriate District Manager (or designee) prior to the brokering of the loan and before the loan file is sent to the new lender. All brokered loan checks require a District Manager (or designee) signature for distribution. Brokered first mortgage loan production will count toward total production and be included in meeting minimum production requirements.
      1. Loans may not be brokered for price.
      2. All 2nd mortgage loans to be brokered out require the additional written approval of the Division Manager prior to the brokering of the loan and before the loan file is *sent to the lender. Brokered out home equity loans are not included in monthly loan volume totals.*

   b. Brokering loans without authorization from a District Manager (or designee) is considered a violation of Employer policies and procedures. All commissions for unauthorized brokered loans are deemed unearned and will not be paid unless such payment is required by law. Additionally, no commission is earned on any loan that has been brokered in a manner that does not comply with all applicable state and federal laws and regulations including, but not limited to, the federal Real Estate Settlement Procedures Act and its related regulations and interpretations.

   c. The following represents Employer's minimum fee income requirement on all brokered loans for purposes of calculating commissions:

| Brokered Out Loan Amount | Minimum Fee Required |
|---|---|
| $0 to $199,999 | 2.00% |
| $200,000 to $499,999 | 1.25% |
| $500,000 or greater | 1.00% |

   Minimum fee income includes only income earned by Employer and does not include fees passed on to third parties. Minimum fee income must be collected. Fee income will not be credited unless these minimum fees are collected and remitted to Employer. Maximum fee income is 3.5% of loan amount. Exceptions to the minimum fee policy must be approved by Division Manager and the EVP Retail Lending.

   d. Income is not credited until it is received in Accounting. For example, if a loan funds in July but the brokered income check is not received until August, income will be credited in August.

e. When the minimum fee is earned by Employer, Base commission is paid using the Commission Rate for the current month less 15 basis points (adjustment for brokered loans) multiplied by the loan amount. Additional commission is only earned:

1. At the discretion of the Division Manager (or designee)
2. On income that is charged by the Lender as part of the program and
3. On income that exceeds the minimum fee established requirements.

This additional commission is paid at a 50/50 split and is limited to a total of 1% of loan amount paid to Employee.

f. If the minimum fee is not collected by Employee, any commission earned by Employee will be reduced in an amount equal to the difference between the minimum fee required, less the actual fee collected, as allowable by law.

g. Example Calculations
   1. A $100,000 loan earning 1.5% of income with a 2.0% minimum fee:
      a. Employee's commission will be reduced by $500 ((2.0%-1.5%) x $100,000).
   2. A $100,000 loan earning 3.5% of income with a 2.0% minimum fee
      a. Base commission is paid at Employee's Commission Rate for the month less 15 basis points. If the Employee is in the 70 bps Commission Rate tier for the month, then the commission paid is $550 (55 bps x $100,000).
      b. Division Manager decides to pay additional commission which is calculated at 50% of $1,500 ((3.50 – 2.00) x $100,000 x 50%) equals $750.

4. Home Equity Commissions
   a. The following table and examples summarize home equity commissions. For all non-brokered home equity products, the commission earned will be the greater of the calculated amount detailed in the table below or $50. There is no minimum commission on brokered home equity products.

Home Equity Commission Table

|  | Credit Only Line (Piggy Back) | Purchase Money Line (Piggy Back) | Stand Alone Line | All Closed-End Loans |
|---|---|---|---|---|
| Commission (Initial draw ≥ $10K) | 25 bps x Line Amount | (Tier – 15 bps) x Line Amt | (Tier – 15 bps) x Line Amt | 45 bps x Loan Amt |
| Commission (Initial draw < $10K) | 25 bps x Line Amount | | | |
| Closing Status to Pay | Funding Requested | Funding Requested | Transferred to Servicing | Piggyback @ Funding; Stand Alone @ Transfer to Servicing |
| Buy Ups | Not Permitted | Each 1/8 increment = 3 bps added Max of 1% (24 bps) | | Each 1/8 increment = 3 bps added Max of 1% (24 bps) |
| Buy Downs | Each 1/8 increment = 3 bps deduction Max of 1.5% (36 bps) | | | Each 1/8 increment = 3 bps deduction Max of 1% (24 bps) |

    b. Examples:
       $50k line, Employee @ 70 bps (no buy up/down)
       Credit Only: $50k x 25 bps = $125
       Purchase Money: $50k x (70-15 bps) = $275
       Stand Alone: $50k x (70–15 bps) = $275

       $50k line, Employee @ 70 bps (with 3/8% buy down)
       Credit Only: $50k x (25-9 bps) = $80
       Purchase Money: $50k x (70-15-9 bps) = $230
       Stand Alone: $50k x (70–15-9 bps) = $230

       $50k line, Employee @ 70 bps (with 3/8% buy up)
       Credit Only: $50k x (25 bps) = $125 (buy up not allowed)
       Purchase Money: $50k x (70-15+9 bps) = $320
       Stand Alone: $50k x (70–15+9 bps) = $320

    c. Exceptions:
       1. Brokered out second mortgage commissions are calculated as a 50/50 split with the Employee, based on total income collected less any third party and document preparation/processing fees. This commission is limited to a total of 1% of the loan amount.
       2. Home equity bridge loan commission is $50, regardless of loan amount.

    d. If a piggyback never reaches a "Transferred to Servicing" status in the Employer's system, the commission payout is unearned and will be deducted from both the Employee and the Branch on the last business day of the second month following closing, and any production credit given will be reversed. If the piggyback does not reach this status, it signifies that the customer did not accept the home equity line.

5. Out of State Business
    a. Subject to restrictions and limitations of applicable law, Employee must follow the Out of State Referral Process (located on the Employer's intranet) in order to earn referral fees for

out of state business. Two general options are available as described below. Please refer to the policy statement on the Employer's intranet for details and exceptions on these options.
  b. Split Commission Option - Employee refers loan to a licensed, in-state Employee and earns a referral fee based on splitting the commission earned by the originating employee. The standard split of commission earned is 25% for referring employee and 75% for originating employee, but negotiated splits are permitted when agreed to by both the referring employee and the originating employee. Employee acknowledges that he/she has no remedies against Employer should there be a dispute regarding a commission split negotiated among employees. The split of commission earned is 50%/50% on referred out of state home equity products.
  c. Flat Fee Option - Employee refers loan to either Direct Lending or an in-state Branch and earns a flat referral fee of 50 basis points (or 25 basis points if the loan is brokered out).

6. Construction Loans
   a. Lot Loan – Commission earned is a flat 25 basis points.
   b. Construction to Permanent One Time Close (1x CPP) – All GMAC Mortgage one time close products are paid according to Section C Calculation of Commissions herein.
   c. Construction to Permanent Two Time Close (2x CPP) – All GMAC Mortgage two time close products are paid according to Section C Calculation of Commissions herein with the following modifications:
      1. At time of initial funding (PILOT status of "Construction Close Complete") the Employee earns commission per Section C (1) BPS Commission Rate above. The Employee receives full production credit.
      2. At time of final funding (PILOT status of "Funding Accepted") the Employee receives a net commission based on the final loan details. Commissions are calculated at the second close and then the total commission paid at first close is netted from this amount. This may increase or decrease the Employee's commission in the month of second close. Production credit may also change if the final loan amount increases or decreases. The net production is added or subtracted from the total for the month of second close. If the loan amount does not change, then no production credit is earned for the second close.
      3. If the Employee has left the organization between the time of initial funding and final funding as described in C(6)(c)(1) and (2) above, the loan will be transferred to another employee in order to monitor the progress toward second closing, maintain direct and regular borrower contact, update the borrower, and address any issues which may arise prior to second close. Any net increase of commission and production earned on the loan will be paid to the reassigned employee. No net decrease of commission or production will be passed on to the reassigned employee.

7. Special Programs
   The commission earned from special programs and new products will be announced as they are made available. Product and program guidelines will describe specific details and will be outlined and posted on the Employer intranet.

8. Close for a Cause Program
   Employee will be compensated 40 basis points per loan closing in accordance with the terms of the Close for a Cause Program as detailed on Employer's intranet site.

D.    DISPUTE OF COMMISSIONS
Employee shall have 30 days from the date of the posting of the commission statement on the Lending Page of Employer's intranet to dispute any commission appearing on such statement. Disputes must be made in writing to the Employee's direct supervisor. Commissions will be deemed as properly paid in accordance with this Agreement if not disputed within the 30 day period.

E.  OFFSET OF COMMISSIONS
    1.  Employee authorizes Employer, as permitted by state law, to deduct from Employee's commissions, expense reimbursements, or any other monies due to Employee, whether Employee is employed pursuant to this Agreement or any prior or future employment agreement, any monies necessary to account for costs or losses incurred by Employer as a result of, but not limited to, outstanding uncollected appraisal fees, credit fees, prepaid commitment fees, Excess Overages, and any other miscellaneous fees chargeable to the borrower but which Employee failed to collect. Additional obligations which Employer may offset against Employee's commissions, expense reimbursements, or any other monies due to Employee in accordance with the foregoing sentence include, but are not limited to losses incurred by Employer due to Employee's failure to properly lock a loan, overpayment of commissions to Employee, Employee's failure to return or Employee's damage to Employer property or leased equipment (including but not limited to telephones, pagers, cameras and laptop computers, printers or fax machines), Employee's failure to pay a corporate credit card balance, Employee sending of unauthorized faxes to consumers in violation of FCC and/or FTC regulations, Employee making unauthorized phone calls to consumer in violation of FCC and/or FTC regulations, unauthorized expenses charged to Employer by Employee, losses sustained by Employer resulting from Employee's misappropriation, fraud or violation of Employer's policies in general or its policies relating to the origination, processing and closing of Loans. If the losses are contingent in nature at the time of an Employee's termination, the amount of potential loss as estimated by Employer will be the amount offset from Employee's commissions, expense reimbursements, or any other monies due to Employee. Should Employee not pay all such obligations to Employer on demand, Employer will offset against Employee's commissions, expense reimbursements, or any other monies due to Employee as detailed herein.

    2.  Loan Officer Assistant Plan
        a.  Employee may be eligible, in the Division Manager's (or designee's) discretion, to utilize an exclusive or shared Loan Officer Assistant ("LOA"). All requests to utilize a LOA must be approved by Employee's Division Manager (or designee). If Employee elects to utilize a LOA, Employee authorizes Employer, as permitted by law, to deduct from Employee's commissions and/or other compensation due to Employee, the full salary expense of the LOA, less the branch reimbursement as reflected in the LOA Expense Reimbursement Table below. Employer will also pay for any applicable LOA benefits.

## Loan Officer Assistant (LOA) Expense Reimbursement Table

| Rolling 3-Month Average of Total Funding Volume | Rolling 3-Month Average of Total Units | Monthly Expense Reimbursement by Branch[1] |
|---|---|---|
| $0 to $999,999 | < 10 | Zero |
| $1,000,000 to $1,499,999 | 10 to 14 | Up to $500 |
| $1,500,000 to $1,999,999 | 15 to 19 | Up to $1,000 |
| $2,000,000 to $2,499,999 | 20 to 24 | Up to $2,000 |
| $2,500,000 or greater | 25 or more | Up to $2,500 |

## Shared Loan Officer Assistant (LOA) Commission Adjustment Table

| Rolling 3-Month Average of Total Units | Rolling 3-Month Average of Total Funding Volume | Monthly Commission Adjustment[1] |
|---|---|---|
| 1 – 4 | $0 - $624,999 | Up to 37 bps |
| 5 – 6 | $625,000 – $749,999 | Up to 35 bps |
| 7 – 10 | $750,000 - $1,249,999 | Up to 30 bps |
| 11 – 14 | $1,250,000 - $1,624,999 | Up to 25 bps |
| 15 – 18 | $1,625,001 - $1,999,999 | Up to 15 bps |
| 19 – 24 | $2,000,000 - $2,374,999 | Up to 8 bps |
| 25 – 29 | $2,375,001 - $3,124,999 | Up to 4 bps |
| 30+ | $3,125,000+ | 0 bps |

1 - Reimbursement and Commission Adjustment only applies to actual salary expenses owed by Employee for utilization of LOA.

Example of Adjustment Calculation

| Producer A* | Producer B** | Producer's A & B Combined – Sharing an LOA*** |
|---|---|---|
| 3-month Average Production $1,250,000 and 8 Units<br><br>LOA Monthly Salary $2,000<br><br>Branch Expense Reimbursement Up to $500<br><br>Net Adjustment to Commission ($1,500) | 3-month Average Production $1,250,000 and 16 Units<br><br>LOA Monthly Salary $2,000<br><br>Branch Expense Reimbursement Up to $1,000<br><br>Net Adjustment to Commission ($1,000) | 3-month Average Production $2,500,000 Total Production and 24 Units<br><br>LOA Monthly Salary $2,000<br><br>Commission Adjustment (split equally among Employees) 4bps ($1,000) |
| * - For Producer A, $1,250,000 is at a higher tier than is the 8 units. Therefore, the highest tier achieved ($1,250,000) is used to determine the expense reimbursement<br>** - For Producer B, the 16 units are at a higher tier than is the $1,250,000. Therefore, the highest tier achieved (15 – 19 units) is used to determine the expense reimbursement<br>*** - In the shared LOA example $2,500,000 is at a higher tier than is the 24 units. Therefore, the highest tier achieved ($2,500,000) is used to determine the commission adjustment, which is then split equally between each Employee sharing the LOA. |||

      b. Employee's Division Manager (or designee), in the Division Manager's sole discretion, may determine that Employee is no longer eligible to utilize a LOA. Should Employee decide to cease utilizing a LOA; or, should Employee's Division Manager, in the Division Manager's (or designee's) sole discretion, determine that Employee is no longer eligible to utilize a LOA.; or, should Employee's employment terminate, either voluntarily or involuntarily, Employee's commissions will be adjusted according to the chart above – based upon Employee's production as of the date that Employee ceases utilizing a LOA. Employee must give the Division Manager (or designee) Written Notice of Employee's intention to cease utilizing a LOA.

      c. Shared LOA: Under the shared LOA plan, Employees sharing a LOA will equally share the commission adjustment, as detailed in the chart above, regardless of each individual Employee's production volume. Should Employee decide to cease utilizing a LOA; or, should Employee's Division Manager (or designee), in the Division Manager's sole discretion, determine that Employee is no longer eligible to utilize a LOA.; or, should Employee's employment terminate, either voluntarily or involuntarily, Employee will still equally share the commission adjustment during the month in which Employee last utilized the LOA. The remaining Employee may continue utilizing the LOA subject to the exclusive plan detailed above. Employee must give the Division Manager (or designee) Written Notice of Employee's intention to cease utilizing a LOA.

      d. Any and all disputes relating to the adjustment of Employee's commission, as detailed above, shall be resolved in the discretion of Employee's Division Manager (or designee).

      e. Approval of Employee's use of an LOA may be revoked without prior notice at any time in the sole discretion of Employer, or as required by law.

  3. Marketing Expenses
If Employee voluntarily elects to utilize the services of third party marketing and/or advertising providers that have entered into service agreements with Employer (which is not a requirement of Employee's job), then Employee authorizes Employer, as permitted by law, to deduct from Employee's commissions and/or other compensation, up to 100% of the Employee pro rata share of expenses due to third party service provider as a result of Employee's use. Examples of third party service agreements include, but are not limited to, Advertising Services Agreements and Third Party Origination agreements (TPO's).

F.   PAYMENT OF COMMISSIONS WHILE ON AN APPROVED LEAVE OF ABSENCE
In addition to all other provisions of this Agreement, in the event of Employee's short term disability, long term disability (as those terms are defined in the Employer's policy and/or disability plan in effect at the commencement of the disability), Family Medical Leave (FMLA), or military leave, Employee will be paid on all loans in the Employee's pipeline at the time of disability as follows:

1. Employee will be paid on all loans within Employee's pipeline as of the first day of Employee's leave, that are final approved, defined as no conditions to be cleared, so long as the loan subsequently Closes.
2. Employee will be paid on a 50/50 split with any loan officer "working the file" on all loans that have been conditionally approved (i.e. conditions other that minor conditions to be cleared, including but not limited to verification of employment, collection of pay stubs, etc.) as of the first day of Employee's leave and that subsequently Close. This arrangement will be more typically used in a situation where Employee goes out on an unanticipated leave of absence. However, subject to District Manager approval, Employee may negotiate a different commission split with another loan officer prior to the commencement of the leave.

3. All loan pricing issues during a leave of absence shall be determined at the discretion of the District Manager and Regional Manager. Any changes in loan processing issues may affect the pay out of commissions to Employee.
4. Commissions will not be paid if a loan needs to be restructured or resold during Employee's leave of absence.

In the event that Employee is terminated while on an approved leave of absence, Employee will be paid in accordance with Section H Compensation After Termination herein.

G. PAYMENT OF COMMISSIONS IN THE EVENT OF RETIREMENT OR DEATH
In the event of retirement (as defined in the Employee's Retirement Plan for GMAC Mortgage Group in effect at the time of termination), or in the event of Employee's death, Employee or Employee's estate, as applicable, will be entitled to commissions on all Loans in the Employee's pipeline at the time of death or retirement, subject to all federal, state and local withholdings and subject to further reduction as provided in Section III of this Agreement.

H. COMPENSATION AFTER TERMINATION
1. For the purposes of determining compensation after termination, the term "Termination" refers to either (a) the date Employer terminates Employee or (b) the date Employee notifies Employer that Employee will be terminating Employee's employment with Employer, whichever is applicable. For example, in the case where Employee gives notice, whether verbally or in writing to Employer on January 1 that Employee will be leaving January 15, January 1 is the date of termination.
2. Commissions will be paid only for loans that are in a Final Approval Status prior to and including Employee's termination date and Closed on or before thirty (30) days after the date of termination. The Loan is considered approved when there are only minor conditions to be cleared, including but not limited to verification of employment, collection of pay stubs.
3. After termination if it is found that Employee, during Employee's period of employment with Employer, was employed in any capacity (employee, independent contractor, agent, etc.) with a company other than Employer engaged in (a) the origination, processing, closing or underwriting of mortgage loans (including second mortgage loans) or (b) any other competing business in which the Employer or any of its affiliate companies are engaged (collectively "Prohibited Employment"), the effective date of Employee's termination shall be the most recent date Employee first commenced employment with any other employer or such later date as Employer has determined.
4. As allowable by law, commission payments will only be paid for Loans Closed up to and including the date of termination in situations (a) where Employee was employed in any capacity as described in Section H (3) above, (b) where Employee has been terminated for cause, (c) where Employee has engaged in actions that have resulted in a loss sustained by Employer, or (d) where Employee has breached this Agreement. Further, commission payments, up to and including the date of termination, may be offset or withheld in accordance with Section E Offset of Commissions of this Agreement.
5. Payment of any earned commissions due will be made in a lump sum on the first regularly scheduled commissions pay day after final calculation of the commissions due, but not later than 60 days after termination. To the extent Employee is eligible to receive any gift, prize, award or bonus under any program, Employee must be actively employed by Employer on the date that such gift, prize, award or bonus must be redeemed or is payable in order to receive such gift, prize, award or bonus.
6. In the event Employee transfers within Employer to a non-producing position, Employee shall remain eligible to receive all earned commission, as defined herein, on loans Closed within 90 days after the transfer date.

I. CHANGES IN COMPENSATION
Employer may change the amount of compensation to be paid to Employee under this Agreement as detailed in Section X, Program Review and Amendments. Any such modification shall apply to Loans Closed, services performed or expenses incurred after the date of the Written Notice.

J. TRUE-UP BONUS
1. Eligibility: An Employee who closes $8 million or more in closed loan volume (including brokered and non-brokered first mortgage production and non-brokered second mortgage production) or who closes 75 or more in units (Unit counts are determined in accordance with Section C(1)(a)) during the calendar year (January 1 through December 31) is eligible for the True-Up Bonus. In addition, an Employee must be employed with Employer on the date that the True-Up Bonus is payable in order to be eligible to receive such bonus.
2. Amount of True-Up Bonus: For any month that an eligible Employee, as described in Section J(1), earns an Equivalent Commission Rate (defined below) less than 50 basis points, they will earn (50 basis points – Equivalent Commission Rate) multiplied by the closed loan volume for each applicable month(s).
    - Equivalent Commission Rate = total commission paid during month (excluding overage commission) x 100 x 100 / closed loan volume
3. Payment of True-Up Bonus: The True-Up Bonus will paid to eligible Employees as soon as it is practicable following the end of the calendar year. Employer reserves the right to change the payment date in accordance with state and federal law.